**Christine KNOX, Plaintiff,**

v.

**WHEELING–PITTSBURGH STEEL CORPORATION, Defendant.**

**Civ. A. No. 5:93C23.**

United States District Court, N.D. West Virginia.

May 18, 1995.

Robert P. Fitzsimmons and Lorraine Eckard–Gaudino, Wheeling, West Virginia, for plaintiff.

George Monroe Schumann, Pittsburgh, Pennsylvania, for defendant.

## MEMORANDUM OPINION AND ORDER

STAMP, Chief Judge.

### I. Background

On January 8, 1993, plaintiff Christine Knox [1] ("Knox") filed this civil action in the Circuit Court of Brooke County, West Virginia, against her employer Wheeling–Pittsburgh Steel Corporation ("Wheeling–Pittsburgh"). On February 11, 1993, Wheeling–Pittsburgh removed the action to this Court on the basis of federal question jurisdiction. On January 31, 1995, Wheeling–Pittsburgh filed a motion for summary judgment. On February 15, 1995, Knox filed a brief in opposition to the motion for summary judgment. On February 22, 1995, Wheeling–Pittsburgh filed a reply brief in support of its motion for summary judgment. By corre-

---

1. James Knox, Christine Knox's husband, now deceased, had also been named as a plaintiff in this civil action. However, his claim was withdrawn at the pre-trial conference and in the pre- trial order. Accordingly, James Knox's claim for loss of consortium in Count VI has been DISMISSED and he has been STRICKEN as a plaintiff in this case.

spondence dated April 3, 1995 and with the consent of the Court, Knox submitted supplemental case law in support of her response to the summary judgment motion. By correspondence dated April 5, 1995, Wheeling–Pittsburgh commented on the authorities in Knox's supplemental response.

This Court has now considered the applicable law as well as the memoranda in support of and in opposition to the motion for summary judgment. For the reasons set forth below, this Court finds that the motion for summary judgment should be denied but that Counts III and IV should be dismissed and that the remainder of this action should be STAYED.

## II. *Facts*

Knox has been employed as a patrolman in the Plant Protection Department of Wheeling–Pittsburgh since 1979. She is a member of the United Steelworkers of America ("the Union"). On January 31, 1991, Wheeling–Pittsburgh and the Union entered into a Collective Bargaining Agreement ("the CBA") which governs the employment relationship between Wheeling–Pittsburgh and its employees, including Knox.

The CBA contains the following provisions which are relevant to this action. Article I Section 1 of the Agreement states that:

[I]t is the continuing policy of the Corporation and the Union that the provisions of this Agreement shall be applied to all employees without regard to ... sex ... consistent with their obligations and/or rights under applicable federal, state and local laws regarding such matters. Sexual harassment shall be considered discrimination under this provision. The representatives of the Union and the Corporation, in all steps of the grievance procedure, and in all dealings between the parties, shall comply with this provision. The Corporation and the Union agree to cooperate in dealing with problems of discrimination where they occur.

Article IX of the Agreement deals with the resolution of grievances and sets forth a three-stage procedure for any "differences" that arise between Wheeling–Pittsburgh and a patrolman such as Knox. Article IX–A of the Agreement states that grievances may be appealed to arbitration. The CBA also provides that each plant shall establish a Joint Committee on Civil Rights ("the Committee"). *See* Article I Section 6. The Committee is required to "review and investigate matters and complaints involving Civil Rights and attempt to resolve same." If the Committee is unable to resolve a civil rights claim, the claim may be pursued as a grievance. The CBA specifically provides that the Committee will not displace the normal operation of the grievance procedure.

Knox claims that Wheeling–Pittsburgh, through its agents and employees, has engaged in continuing acts to harass, degrade, and embarrass Knox by subjecting her to unwelcome sexual exploitation by depicting her in pornographic posters, by using inappropriate language which was discouraged by her, by using the telephone in a harassing manner, and by creating a sexually harassing and hostile work environment. Knox, or the Union on her behalf, initially pursued these allegations under the CBA's grievance procedure. However, instead of pursuing the grievance procedure through arbitration, Knox filed this civil action. Counts I, II, and IV of Knox's complaint can best be characterized as a federal civil rights claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e and a state civil rights claim under the West Virginia Human Rights Act, W.Va.Code § 5–11–9. Count III attempts to state a claim for breach of contract. Count V alleges a state law claim for the tort of outrage.

## III. *Contentions of the Parties*

Wheeling–Pittsburgh argues that any state law causes of action raised in the complaint are preempted by the federal Labor Management Relations Act ("LMRA") because resolution of such state law claims will require interpretation of the CBA. Wheeling–Pittsburgh then argues that, since LMRA preempts these claims, this Court must construe them as claims arising under § 301 of LMRA. Wheeling–Pittsburgh contends that the complaint fails to state any claim under § 301 because Knox has not exhausted her remedies under the CBA and also because she has failed to allege any unfair labor

practices by the Union. Wheeling–Pittsburgh further argues that Knox's federal civil rights claim must also fail because Knox did not exhaust her administrative remedies under the CBA.

Knox argues that LMRA does not preempt her state law claims against Wheeling–Pittsburgh because this Court will not be required to interpret the CBA to resolve any such claims. Further, Knox argues that her failure to exhaust administrative remedies is not fatal to this cause of action.

### IV. *Applicable Standards*

Wheeling–Pittsburgh has brought these matters now before this Court by way of a motion for summary judgment. According to Fed.R.Civ.P. 56(c), summary judgment is only appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Id.*

■ This Court finds that the matters before this Court are not appropriately addressed in the context of a summary judgment motion. The issues involving LMRA preemption and the arbitrability of Knox's federal and state civil rights claims do not require this Court to determine whether there is sufficient evidence to present to a jury. Instead, these issues are of a more preliminary nature. Therefore, Wheeling–Pittsburgh's motion for summary judgment is hereby DENIED on that technical basis. Nevertheless, this Court will address below the merits of Wheeling–Pittsburgh's motion.

### V. *LMRA Preemption*

1. *Applicable Law Regarding LMRA Preemption*

■ Section 301 of LMRA authorizes federal courts to hear suits for violations of contracts between an employer and a labor organization. 29 U.S.C. § 185(a). In order to ensure that such disputes are resolved uniformly, the Supreme Court has determined that § 301 preempts state actions regarding labor contract disputes and that such disputes must be resolved under a uniform federal labor law. *See Allis–Chalmers Corp.*

*v. Lueck,* 471 U.S. 202, 211, 105 S.Ct. 1904, 1911, 85 L.Ed.2d 206 (1985). Specifically, the Court has held that § 301 preempts suits which require the interpretation of a collective bargaining agreement, such as a suit for breach of a collective bargaining agreement. *Id.; see also Lingle v. Norge Division of Magic Chef, Inc.,* 486 U.S. 399, 413, 108 S.Ct. 1877, 1885, 100 L.Ed.2d 410 (1988). The Supreme Court has cautioned, however, that "not every dispute concerning employment, or tangentially involving a provision of a collective-bargaining agreement, is preempted by § 301." *Allis–Chalmers,* 471 U.S. at 211, 105 S.Ct. at 1911. For instance, LMRA does not preempt state law rights and obligations which exist independently of collective bargaining agreements. *Id.* at 213, 105 S.Ct. at 1912.

In *Lingle,* the Court held that § 301 did not preempt an employee's state law claim of discriminatory discharge even though the collective bargaining agreement also prohibited discriminatory discharge. The Court held that the state law action was independent of the collective bargaining agreement even though the state law claim was virtually identical to the grievance under the collective bargaining agreement. The Court explained that, despite this similarity, resolution of the discrimination claim did not require interpretation of the collective bargaining agreement. 486 U.S. at 410, 108 S.Ct. at 1883. The Court did suggest, however, that this parallelism could *possibly* preclude an employee from pursuing a "nonpreempted" state law action if the union had waived its members' "nonpreempted" state law claims. *Id.* at 409 n. 9, 108 S.Ct. at 1883 n. 9. However, the Court declined to address whether such a waiver was possible and stated, that if it were possible, "we would require 'clear and unmistakable evidence'" of such a waiver. *Id.*

More recently, in *Livadas v. Bradshaw,* —— U.S. ——, 114 S.Ct. 2068, 129 L.Ed.2d 93 (1994), the Court summarized the types of "independent" state law claims which are not preempted by § 301:

[W]e [underscore] the point that § 301 cannot be read broadly to preempt non-

negotiable rights conferred on individual employees as a matter of state law, and we [stress] that it is the legal character of a claim, as "independent" of rights under the collective-bargaining agreement, that decides whether a state cause of action may go forward. Finally, we [are] clear that when the meaning of contract terms is not the subject of dispute, the bare fact that a collective-bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished.

*Id.* at ——, 114 S.Ct. at 2078 (citations omitted). The *Livadas* Court referred to the statement in *Lingle* regarding waiver of "nonpreempted" state rights thereby suggesting that a waiver would in fact be possible. *Id.* at ——, 114 S.Ct. at 2079. The Court also suggested that it might have been significant if the parties to the collective bargaining agreement understood the arbitration clause to cover their non-preempted state law claims. *Id.* at ——, 114 S.Ct. at 2079 (citing *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 35–36, 111 S.Ct. 1647, 1657, 114 L.Ed.2d 26 (1991)).

### 2. *Application of Preemption Principles to Knox's Complaint*

#### Count III Breach of Contract

■ Count III alleges that Wheeling–Pittsburgh violated the CBA in violation of state law. Since this Court would be required to interpret the CBA to resolve this claim, it is preempted by § 301 and should be dismissed with prejudice. *Allis–Chalmers,* 471 U.S. at 220, 105 S.Ct. at 1915–16.

■ Furthermore, Count III is also subject to dismissal to the extent that it attempts to state a federal claim under § 301 for breach of the CBA. In order to pursue a § 301 action, an employee must exhaust her administrative remedies and allege that the Union breached its duty of fair representation. *See DelCostello v. International Brotherhood of Teamsters,* 462 U.S. 151, 164–65, 103 S.Ct. 2281, 2290–91, 76 L.Ed.2d 476 (1983). Since Knox has not exhausted her

administrative remedies or alleged that the Union breached its duty of fair representation, she has failed to state a § 301 claim. Therefore, any federal claim for breach of the CBA in Count III should also be dismissed. However, this dismissal should be without prejudice so that Knox may seek leave to amend her complaint to properly state a federal claim for breach of the CBA.

### Counts I, II, and IV Sexual Harassment and Discrimination

■ Counts I, II and IV of the complaint make various allegations of sexual harassment and discrimination. Although the complaint does not specify the basis for these allegations, it is apparent that these counts attempt to state a claim under the West Virginia Human Rights Act, W.Va.Code § 5–11–9, which prohibits sexual discrimination in the work place.[2] Applying the principles set forth in *Lingle* and *Livadas,* this Court finds that § 301 does not preempt Knox's Human Rights Act claim since this claim does not require interpretation of the CBA and exists independently of the CBA.

Resolution of Knox's state law claims will not require interpretation of the CBA since the terms of the CBA are irrelevant in determining whether Wheeling–Pittsburgh violated the Human Rights Act. Like the retaliatory discharge claim discussed in *Lingle,* the elements of a discrimination claim under the Human Rights Act pertain to the conduct and motivation of the employer under statutory standards, rather than the standards of the CBA. *See Martin Marietta Corp. v. Maryland Comm'n on Human Relations,* 38 F.3d 1392 (4th Cir.1994). *See also Smolarek v. Chrysler Corp.,* 879 F.2d 1326 (6th Cir. 1989), *cert. denied,* 493 U.S. 992, 110 S.Ct. 539, 107 L.Ed.2d 537 (1989); *Miller v. AT & T Network Systems,* 850 F.2d 543 (9th Cir. 1988).

■ Furthermore, Knox's rights under the state statute exist independently of the CBA even though the CBA specifically mentions the right to be free from discrimination.

**2.** As previously noted, these counts also allege violations of Knox's federal civil rights to be free from sexual harassment in the workplace. However, these federal civil rights claims are not subject to LMRA preemption.

Simply put, discrimination in the work place is illegal regardless of whether such discrimination is also prohibited by the collective bargaining agreement. Thus, even though the CBA may have been "crystal clear" in prohibiting discrimination, it is not necessary to interpret the CBA to resolve the state law discrimination claim because Wheeling–Pittsburgh might have ignored that prohibition. *See Ramirez v. Fox Television Station, Inc.,* 998 F.2d 743, 748 (9th Cir.1993); *Foster v. Richardson,* 843 F.Supp. 625, 629 (D.Haw. 1994).

■■■■ As noted above, even if an employee's claim is not preempted, it may nevertheless be barred if there is "clear and unmistakable evidence" that the Union bargained away the employee's right to pursue that state law claim. *See Lingle* 486 U.S. 399, 409 n. 9, 108 S.Ct. 1877, 1883 n. 9. However, this exception is not applicable here since there is no evidence, and certainly not "clear and unmistakable evidence," that the Union waived Knox's right to pursue any state law remedies. As the CBA contains an extremely thorough discussion of discrimination, if Wheeling–Pittsburgh and the Union intended such a waiver, it would have been specifically stated. Since no such waiver was specifically included this Court finds that none was intended.

The *Livadas* Court had also suggested that it would be relevant if the parties to the collective bargaining agreement understood the arbitration clause to cover their non-preempted state law claims. *Id.* at ——, 114 S.Ct. at 2079 (citing *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 35–36 111 S.Ct. 1647, 1657, 114 L.Ed.2d 26 (1991)). Wheeling–Pittsburgh interprets this statement to mean that LMRA preemption exists in the event of such an understanding. However, *Gilmer* does not relate to LMRA preemption but rather addresses the enforceability of private agreements to arbitrate statutory rights. Therefore, this Court interprets the *Gilmer* reference in *Livadas* as simply suggesting that employees may personally waive their statutory civil rights by personally agreeing to arbitrate those rights, an event which did not occur here.

Accordingly, this Court finds that the state law claims in Counts I, II, and IV are not preempted and should not be dismissed.

## Count V Tort of Outrage

■■■ The West Virginia Supreme Court of Appeals describes the tort of outrage as follows:

> One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

*Harless v. First Nat'l Bank in Fairmont,* 169 W.Va. 673, 289 S.E.2d 692, 703 (1982). The gravamen of a claim for outrage is conduct so atrocious and "utterly intolerable in a civilized community" that it is beyond the bounds of decency. *Id.* 289 S.W. at 703–704; *Keyes v. Keyes,* 182 W.Va. 802, 392 S.E.2d 693, 696 (1990).

■■■ This Court finds that Knox's claim for the tort of outrage is not preempted by § 301. Like Knox's claim under the West Virginia Human Rights Act, Knox's allegation of outrage will not require interpretation of the collective bargaining agreement for resolution. Whether Wheeling–Pittsburgh acted consistently with the CBA, is irrelevant to whether its actions violated the standards of outrageous conduct under state law. *See Jackson v. Kimel,* 992 F.2d 1318, 1327 (4th Cir.1993) ("It is not necessary to determine whether [the employer] owed a duty to refrain from the alleged conduct; the collective bargaining agreement cannot authorize his alleged behavior.").

■■■ Even though Count V is not subject to LMRA preemption, this Court finds that it should be dismissed. It is a well-established principle that federal and state anti-discrimination laws, such as Title VII and the West Virginia Human Rights Act, preempt *Harless*-type, tort-based actions for discriminatory treatment in the workplace. *See Taylor v. City National Bank,* 642 F.Supp. 989, 998 (S.D.W.Va.1986). Since the basis of Knox's claim of outrage in Count V is identical to her federal and state civil rights claims in Counts I, II, and IV, this Court finds that Count V is preempted by West

Virginia Human Rights Act and Title VII. Accordingly, Count V should be dismissed with prejudice.

## VI. *Disposition of Civil Rights Claims*

As previously noted, Counts I, II, and IV of Knox's complaint allege violations of her federal and state civil rights. In light of the above rulings, these are the only claims of the complaint not subject to dismissal. However, for the reasons set forth below, this Court finds that Knox must complete the arbitration process set forth in the CBA before she may proceed to trial on these claims.

■ The CBA governing Knox's employment invokes federal and state rights to be free from discrimination and incorporates these rights as terms of her employment. The CBA also establishes a Civil Rights Committee which is expressly authorized to handle civil rights claims. Civil rights claims may be presented to the Committee for initial consideration or may be pursued directly as a standard grievance. Although the CBA does not define the term "civil rights", the common meaning of the term suggests that it incorporates claims under federal and state anti-discrimination laws. These provisions demonstrate to this Court that the parties understood the arbitration clause in the CBA to cover Knox's federal and state law discrimination claims.

Knox and Wheeling–Pittsburgh strongly dispute the validity and effect of this understanding. Wheeling–Pittsburgh argues that Knox is bound by this understanding and that it represents her exclusive remedy for violations of her state and federal civil rights. Knox argues that she may pursue her civil rights allegations without regard to the arbitration agreement. After an extensive review of the relevant authority, this Court finds that the answer lies somewhere between these two alternatives.

In *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974), the Supreme Court determined that an employee could pursue a Title VII action even though he had already submitted his discrimination claim to final arbitration under the non-discrimination clause of a collective bar-

gaining agreement. In holding that the employee was not limited to a remedy under the collective bargaining agreement, the Court relied on the legislative history of Title VII which indicated that Congress designed Title VII "to supplement rather than supplant, existing laws and institutions relating to employment discrimination." *Id.* at 48–49, 94 S.Ct. at 1020. The Court also relied on the principle that a Union cannot waive an employee's Title VII rights prospectively:

> Title VII's strictures are absolute and represent a congressional command that each employee be free from discriminatory practices. Of necessity, the rights conferred can form no part of the collective-bargaining process since waiver of these rights would defeat the paramount congressional purpose behind Title VII. .

*Id.* Finally, the Court noted that, since the arbitrator only had authority to resolve questions of contractual rights, the employee had not yet arbitrated his statutory rights to be free from discrimination. *Id.* 53–54, 94 S.Ct. at 1022–23.

The *Alexander* Court rejected the notion that it was unfair to allow an employee to avoid the preclusive effect of the arbitration process by allowing him to file a Title VII action if he was unsatisfied with the arbitrator's decision while the employer would be bound by the arbitral award. The Court explained:

> In instituting an action under Title VII, the employee is not seeking review of the arbitrator's decision. Rather, he is asserting a statutory right independent of the arbitration process. An employer does not have "two strings to his bow" with respect to the arbitral decision for the simple reason that Title VII does not provide employers with a cause of action against employees. An employer cannot be the victim of discriminatory employment practices.

*Id.* Next, the Court rejected the argument that its ruling would discourage employers from including arbitration clauses in collective bargaining agreements. *Id.* The Court explained that "[w]here the collective-bargaining agreement contains a nondiscrimination clause similar to Title VII, and where

arbitral procedures are fair and regular, arbitration may produce a settlement satisfactory to both employer and employee." *Id.*

Finally, the Court rejected the suggestion that federal courts should defer to arbitral decisions in claims where: "(i) the claim was before the arbitrator; (ii) the collective-bargaining agreement prohibited the form of discrimination charged in the suit under Title VII; and (iii) the arbitrator has authority to rule on the claim and to fashion a remedy." The Court conceded that "the tension between contractual and statutory objectives may be mitigated where a collective-bargaining agreement contains provisions facially similar to those of Title VII." *Id.* at 57, 94 S.Ct. at 1024. Nevertheless, the Court explained that a deferral policy would contradict congressional intent that the federal courts exercise final responsibility for enforcement of Title VII. *Id.* at 55–56, 94 S.Ct. at 1023.

 In *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991) the Supreme Court revisited the arbitrability of civil rights claims. The *Gilmer* Court considered an employee's ability to pursue a civil rights claim under the Age Discrimination in Employment Act ("ADEA") where the employee had agreed in a securities registration application that he would arbitrate such statutory claims. The *Gilmer* Court held that the employee was bound by the agreement to arbitrate his civil rights claim and that it was his exclusive remedy for violations of his civil rights. The Court's ruling was largely based on the rule that a party should be held to an agreement to arbitrate statutory claims unless Congress intended to preclude a waiver of judicial remedies for the statutory rights at issue. *Id.* at 26–27, 111 S.Ct. at 1652. Although *Gilmer* was an ADEA case, its rationale and holding have been extended to employment discrimination claims brought under Title VII. *See Mago v. Shearson Lehman Hutton, Inc.*, 956 F.2d 932 (9th Cir.1992). Thus, under *Gilmer*, an employee may waive his Title VII rights in a privately negotiated agreement.

Although *Gilmer* appears to afford arbitration agreements a higher level of protection than would be acceptable under *Alexander*, it is well-established that *Gilmer* did not reverse *Alexander*. As the *Gilmer* Court noted, there are three significant distinctions between the cases which explain the difference in their rulings: 1) *Alexander* considered arbitration of contractual rather than statutory claims; 2) unlike *Gilmer*, the arbitration in *Alexander* occurred in the context of a collective-bargaining agreement thereby implicating "the tension between collective representation and individual statutory rights"; and 3) *Gilmer* was decided under the FAA which reflects a "liberal federal policy favoring arbitration agreements." *Id.* at 35, 111 S.Ct. at 1657.[3]

 As previously noted, the CBA now before this Court provides for the arbitration of Knox's statutory civil rights claims. Since *Alexander* prohibited the Union from waiving Knox's civil rights in a collective bargaining agreement, this Court finds that this agreement to arbitrate does not constitute a *waiver* of Knox's right to pursue a court action for violations of her civil rights.[4] However, this does not establish that the agreement to arbitrate is invalid in its entirety. In other words, while the Union could not agree on behalf of Knox that arbitration would constitute her *exclusive* remedy, did the Union, nevertheless, bind Knox to pursuing the arbitration?

Several federal district courts have interpreted *Alexander* and *Gilmer* as prohibiting any form of compulsory arbitration of Title VII claims in the collective bargaining context. *See Randolph v. Cooper Industries*, 879 F.Supp. 518 (W.D.Pa.1994); *Block v. Art Iron, Inc.*, 866 F.Supp. 380 (N.D.Ind.1994); *Claps v. Moliterno Stone Sales, Inc.*, 819 F.Supp. 141 (D.Conn.1993). These courts have assumed that, since *Gilmer* involved a private agreement to arbitrate, the principles in *Gilmer* allowing mandatory arbitration of civil rights claims do not apply to arbitration agreements in collective bargaining agree-

---

**3.** In *Livadas,* the Court reiterated that *Gilmer* is consistent with *Alexander.* *See* —— U.S. at —— n. 21, 114 S.Ct. at 2080 n. 21.

**4.** Such a waiver could be found only if Knox had personally consented to such a waiver.

ments. This Court believes that such a conclusion reflects an overly narrow interpretation of the relevant case law. For the reasons set forth below, this Court finds that binding agreements to arbitrate civil rights claims in collective bargaining agreements may be appropriate in certain cases, such as the one now before this Court.

*Alexander* clearly prohibits a Union from waiving an employee's Title VII rights in a collective bargaining agreement. As discussed above, the Court reached this conclusion by balancing the tension between collective representation and individual statutory rights. The Court determined that civil rights are so important that a Union cannot *waive* them or use them as a bargaining chip without an employee's consent. However, since the danger that a Union would jeopardize an employee's civil rights is lessened if the employee participates in an arbitration agreement, the *Gilmer* Court held that such an agreement would constitute a valid waiver of civil rights.

To this Court, *Gilmer* establishes that Title VII rights do not always override the policy favoring arbitration of employment disputes. Instead, there is a balancing test under which restrictions on Title VII rights are allowed so long as the balance between collective representation and an employee's statutory rights is properly maintained. Under this balancing test, *exclusive* arbitration of Title VII rights without an individual employee's consent is prohibited. *Accord Adams v. Burlington Northern R.R. Co.*, 843 F.Supp. 686, 691 (D.Kan.1994) ("A better interpretation [of *Alexander*] is that the Supreme Court recognized that arbitration required under a collective bargaining agreement should not be the *sole* remedy for claims based on statutory rights.") (emphasis added). However, *non-exclusive* arbitration without an individual employee's consent may be permissible if the tension between collective representation and an employee's statutory rights are properly balanced. This Court finds that the CBA in this case adequately balances these competing interests.

Requiring Knox to arbitrate her civil rights claims is clearly consistent with the federal policy in favor of collective representation and the arbitration of employment disputes. Even though the arbitration will not be binding on Knox, it serves an important role by providing the parties the opportunity to resolve their dispute in a non-judicial forum.

Furthermore, mandatory non-exclusive arbitration under this CBA properly reflects the importance of civil rights in the employment context. As discussed above, this CBA reflects a spirit of mutual cooperation regarding resolution of discrimination claims as evidenced by the CBA's incorporation of state and federal discrimination standards. Also, by incorporating discrimination as a grievance, the Union has obtained an remedy for Knox which might not otherwise be available. Finally, since the arbitration would not be Knox's exclusive remedy, the Union has not improperly used Knox's civil rights as a point of negotiation nor has the Union waived any of Knox's statutory civil rights. Following arbitration, Knox will be free to pursue her civil rights action to trial if she so desires.

This Court recognizes that such an exhaustion requirement theoretically places an employee's Title VII rights at jeopardy since the statute of limitations on a Title VII action appears not to be tolled while an employee pursues administrative remedies under a CBA. *See International Union of Elec. Workers v. Robbins & Myers, Inc.*, 429 U.S. 229, 236–40, 97 S.Ct. 441, 447–49, 50 L.Ed.2d 427 (1976). For example, in *Hammontree v. N.L.R.B.*, 925 F.2d 1486 (11th Cir.1991) (en banc), the Eleventh Circuit, in dicta, rejected the notion of an exhaustion or deferment requirement under Title VII. Judge Edwards, in a concurring opinion, noted that "[w]ere there an exhaustion of remedies requirement under Title VII, the Court's holding in *Robbins & Myers* would have the drastic effect of rendering many Title VII claims time-barred while still in arbitration, hardly a result which would preserve the independence of the two remedies." *Id.* at 1501. Although valid, this concern is easily addressed by limiting the exhaustion requirement to proceeding to trial rather than the filing of a civil rights action. In other words, Knox was free to pursue this court action for

violations of her civil rights but she cannot proceed to trial until she has exhausted her administrative remedies in good faith.

Under this ruling, the only consequence of the non-exclusive arbitration agreement is that Knox must pursue arbitration before she may proceed to trial. In this case, since discovery appears to be complete and the parties ready for trial, this would necessitate a stay of the action pending arbitration. *See Woods v. Safeway Stores, Inc.,* 420 F.Supp. 35, 40 (E.D.Va.1976), *aff'd,* 579 F.2d 43 (1978), *cert. denied,* 440 U.S. 930, 99 S.Ct. 1267, 59 L.Ed.2d 486 (1979) ("[T]here is clearly room in the Title VII procedure for a court to stay any judicial action on a Title VII allegation until the arbitration has concluded."). At most, this may cause a delay in Knox's ability to resolve her civil rights claim. However, the Court notes that Knox bears the responsibility for any delay since such delay will result from her failure to proceed with the arbitration.[5]

This Court finds that such a result is fully consistent with the concerns expressed in *Alexander* and *Gilmer* regarding the preeminence of Title VII rights compared to the federal policy favoring arbitration of labor disputes. For example, as discussed above, *Alexander* noted that "Title VII was designed to *supplement* rather than *supplant,* existing laws and institutions relating to employment discrimination." *See* 415 U.S. at 48–49, 94 S.Ct. at 1020 (emphasis added). The result reached here comports with this Congressional intent by allowing Title VII to co-exist with, rather than displacing, the policy encouraging mandatory arbitration of employment disputes under collective bargaining agreements. Also, *Alexander* stressed

the Congressional intent that the federal courts exercise *final* responsibility for enforcement of Title VII. This intent is fully satisfied here since Knox will be able to pursue her civil action if she is unsatisfied with the arbitration. Finally, the *Alexander* Court specifically recognized that "the tension between contractual and statutory objectives may be mitigated where a collective-bargaining agreement contains provisions facially similar to those of Title VII." 415 U.S. at 57, 94 S.Ct. at 1024.

Under these circumstances, this Court finds that the arbitration agreement in the CBA is fully consistent with Knox's civil rights. So long as the arbitration is not her exclusive remedy, the CBA appropriately balances the relevant interests and Knox's consent was not required for mandatory arbitration of her civil rights claim. Thus, while the Union has not waived Knox's right to pursue a Title VII action, it has properly agreed on her behalf that she will pursue non-binding arbitration.

■ For these reasons, Knox must exhaust her administrative remedies before proceeding to trial on this action for violation of her Title VII rights.[6] If she is not satisfied with the result of the administrative procedure, she may then pursue her Title VII action to trial.[7] Furthermore, although *Alexander* and *Gilmer* addressed only the arbitration of federal civil rights, this Court finds that the same principles should apply to the Knox's state law civil rights claims. *See Livadas,* —— U.S. at ——, 114 S.Ct. at 2079 (citing *Gilmer* in the context of a state law claim). Therefore, Knox is also required to

---

5. This delay could have been avoided if Knox had pursued the arbitration and this civil action concurrently.

6. This Court finds that Knox has not demonstrated that these procedures would be futile.

7. The *Alexander* Court explained the procedure as follows: "The federal court should consider the employee's claim *de novo.* The arbitral decision may be admitted as evidence and accorded such weight as the court deems appropriate." 415 U.S. at 59, 94 S.Ct. at 1025. However, the *Alexander* Court did not adopt any standards as to the weight arbitral decisions should be afforded. Instead, courts must consider the facts and

circumstances of each case to determine the weight the arbitrator's decision should carry.

Relevant factors include the existence of provisions in the collective-bargaining agreement that conform substantially with Title VII, the degree of procedural fairness in the arbitral forum, adequacy of the record with respect to the issue of discrimination, and the special competence of particular arbitrators. Where an arbitral determination gives full consideration to an employee's Title VII rights, a court may properly accord it great weight. *Id.* at 60 n. 21, 94 S.Ct. at 1025 n. 21.

arbitrate her state law claim before she can pursue that claim at trial.

### VII. *Conclusion*

For the reasons set forth above, this Court finds that Wheeling–Pittsburgh's motion for summary judgment should be and hereby is DENIED. Instead, the state law claim for breach of contract in Count III is DISMISSED with prejudice but, to the extent Count III alleges a federal claim for breach of contract, it is DISMISSED without prejudice. Next, Count V, tort of outrage, is DISMISSED with prejudice. Finally, the trial of Counts I, II, and IV of this civil action alleging federal and state civil rights violations is hereby STAYED pending resolution of the administrative procedure set forth in the CBA. The parties are hereby DIRECTED to advise this Court upon the resolution of those matters so that this action may be reinstated to the active docket of this Court.

IT IS SO ORDERED.